# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**THE CALWELL PRACTICE, PLLC and
CALWELL LUCE DITRAPANO, PLLC,
Defendants Below, Petitioners**

**FILED**

**May 23, 2024**

ASHLEY N. DEEM, DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**v.) No. 23-ICA-220**       (Cir. Ct. Putnam Cnty. Case No. CC-40-2004-C-465)

**JAMES F. HUMPHREYS & ASSOCIATES, L.C.,
Plaintiff Below, Respondent**

## MEMORANDUM DECISION

Petitioners The Calwell Practice, PLLC and Calwell Luce diTrapano, PLLC (collectively "Calwell") appeal the May 2, 2023, order of the Circuit Court of Putnam County. In that order, the circuit court granted summary judgment in favor of Respondent James F. Humphreys & Associates, L.C. ("Humphreys") and against Calwell regarding a dispute over a fee sharing agreement between the parties. Humphreys filed a response.[1] Calwell filed a reply.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2022). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds that there is no error in the circuit court's order and no substantial question of law. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

This matter concerns a fee sharing agreement between the parties. Beginning in 2004, the Monsanto Company ("Monsanto") was the subject of approximately fifty-five civil suits in West Virginia alleging toxic exposure from its plant in Nitro, West Virginia. At the inception of the Monsanto litigation, the parties herein served as co-counsel and their work and fee sharing arrangement was memorialized by a Memorandum of Understanding that involved equal sharing of both costs and potential attorneys' fees that would be awarded.

In January of 2012, the parties agreed to terminate Humphreys' involvement in the Monsanto litigation. To that end, the parties entered into a fee sharing agreement whereby Humphreys agreed to withdraw from the litigation in exchange for Calwell's agreement

---

[1] Calwell is represented by R. Booth Goodwin II, Esq., Benjamin B. Ware, Esq., Stephanie H. Daly, Esq., and L. Dante' diTrapano, Esq. Humphreys is represented by J. Zak Ritchie, Esq., Michael B. Hissam, Esq., and Andrew C. Robey, Esq.

that in the event of a settlement or favorable verdict, Humphreys would receive 12.5% of any settlement or verdict up to $110,000,000.00. The fee sharing agreement states, in relevant part:

> In addition to the Expenditure Reimbursement Amount described herein, solely in the event of a settlement or a favorable verdict, JH shall further be entitled to receive a negotiated share of Attorney's fees ("Attorney's fees") of 12.5% of Attorney's fees calculated as a percentage of any settlement or verdict up to $110,000,000.00. By way of example, if the case is awarded a judgment or is settled for $110,000,000.00 or less, JH shall be entitled to receive an amount equal to 12.5% of any attorney's fees awarded.

In February of 2012, the Monsanto litigation settled. The terms of settlement were memorialized in two separate agreements: the Property Class Settlement Agreement and the Medical Monitoring Class Settlement Agreement, both of which were approved by the circuit court in January of 2013. Under those agreements, Monsanto agreed to pay up to $84,000,000.00 for medical monitoring claims and $9,000,000.00 for property cleanup. In consideration of this settlement, the circuit court awarded Calwell attorneys' fees and expenses in the amount of $20,000,000.00. As required by the fee sharing agreement, Calwell paid Humphreys the 12.5% negotiated share of this initial fee award.

The then-presiding judge of the circuit court, the Honorable Derek C. Swope, also approved a potential additional $9,500,000.00 for future attorneys' fees, the receipt of which was contingent upon the satisfaction of certain milestones. These future fee awards would be paid out of an interest-bearing escrow account (referred to as the "Contingent Attorney's Fees Fund"), which was funded exclusively by Monsanto. From that fund, Calwell would receive $200.00 in attorneys' fees for each class member to register and qualify for property cleanup. Calwell would also receive $500.00 in attorneys' fees for each class member to register and qualify for medical monitoring. These periodic awards were commonly referred to as "periodic incentive awards." Again, in recognition of the fee sharing agreement, Calwell paid Humphreys the 12.5% negotiated share of these periodic incentive awards.

The Medical Monitoring Class Settlement Agreement also contained a "triggering event," which was tantamount to a final incentive award. If one hundred class members registered to participate in serum dioxin screening and 25% of those participants presented with defined levels of dioxin in their system, then additional benefits would be provided to the class. And, in consideration of those additional benefits, Calwell would be awarded the remaining $6,500,000.00 from the Contingent Attorney's Fees Fund when and if the triggering event occurred.

On June 23, 2014, Humphreys filed a charging lien against the settlement fund. This lien was eventually the subject of a June 2014 hearing in circuit court. Following the

hearing, the circuit court entered what the parties refer to as the "2014 Order." That order states, in relevant part:

> The Court FINDS and ORDERS that Mr. Calwell and Mr. Humphreys have agreed that Mr. Humphreys shall receive twelve (12) and a half percent from the attorney's fees Mr. Calwell receives as Class Counsel in both the property and medical monitoring class settlements. The Court further ORDERS that Mr. Humphreys receive twelve (12) and half percent of any incentive payments Mr. Calwell receives for the number of Class Members who register for medical monitoring or property clean-up benefits. Once a level of five hundred (500) participants are registered, the Court will release the incentive fee payments to Mr. Calwell in the amounts of Five Hundred Dollars ($500) for each medical monitoring participants and Two Hundred Dollars ($200) for each property remediation participants. These fees will be released at each interval of 500 persons registered and at the end of the Registration Period. Finally, the Court ORDERS that Mr. Humphreys receive twelve (12) and a half percent of any attorney's fee payments that Mr. Calwell receives based upon the occurrence of the triggering event. Mr. Calwell must also reimburse Mr. Humphreys for his costs.

At some point thereafter, it became evident that the "triggering event" would not occur. The serum dioxin screening was unlikely to yield the necessary results to satisfy the triggering event. Calwell then questioned the reliability of those screening results. As a result, Monsanto and Calwell agreed to amend the Medical Monitoring Class Settlement Agreement, resulting in the Modified Medical Monitoring Class Settlement Agreement. In that modified agreement, Monsanto and Calwell agreed that, despite the non-occurrence of the "triggering event," the class would nonetheless be afforded additional screening and Calwell would instead be awarded $3,000,000.00 (rather than $6,500,000.00) from the Contingent Attorney's Fees Fund.

Relevant to Calwell's arguments on appeal, prior to the circuit court's approval of the modified agreement, Humphreys filed for Chapter 11 bankruptcy. *See In re James F. Humphreys & Assocs., L.C.*, 554 B.R. 355 (Bankr. S.D. W. Va. 2016). In February of 2016, Humphreys filed its Schedule of Assets and Liabilities and Statement of Financial Affairs. There, Humphreys disclosed "referral/joint representation agreements" as one of the various classes of assets available for administration. In November of 2016, Humphreys filed its Combined Plan of Reorganization and Disclosure Statement, which proposed, among other things, that the reorganized firm assume all "Co-Counsel Agreements" as a part of its reorganization. In February of 2017, the bankruptcy court approved Humphreys' disclosure statement, finding that it contained "adequate information," and confirmed the plan of reorganization. During the bankruptcy proceeding, Humphreys received a payment from Calwell for the Monsanto litigation, which Humphreys directed be paid to a debtor entity rather than Humphreys personally.

3

In September of 2017, the circuit court approved the modified agreement, and awarded Calwell $3,000,000.00 as a final fee award. But, unlike the earlier fee awards, Calwell failed to remit to Humphreys the 12.5% negotiated share. This final fee award is the subject of the present dispute.

On May 20, 2020, Humphreys filed its underlying complaint in the Circuit Court of Kanawha County alleging a single count of breach of contract. Eventually, the case was transferred to the Circuit Court of Putnam County which presided over the Monsanto litigation. The matter was then reassigned from Judge Swope, who presided over the Monsanto litigation, to the Honorable Joseph Reeder due to Judge Swope's obligations on the Mass Litigation Panel regarding on-going opioid litigation. Thereafter, the parties filed dueling motions for summary judgment.

On May 2, 2023, the circuit court granted summary judgment in favor of Humphreys against Calwell. In that order, the circuit court held that there is no dispute that under the fee sharing agreement, Humphreys is entitled to 12.5% of fees awarded in the Monsanto litigation and further, there can be no dispute that the $3,000,000.00 in question are fees awarded in the Monsanto litigation and therefore, Humphreys is entitled to 12.5%. The circuit court further held that nothing in the fee agreement limited Humphreys' recovery to a "triggering event." Lastly, the circuit court declined to step into the shoes of the bankruptcy court regarding the sufficiency of Humphreys' disclosures. The circuit court held that Calwell had presented no evidence that suggested that the fee sharing agreement was intentionally concealed from the bankruptcy court and, therefore, Humphreys was not judicially estopped for asserting his claim for breach of contract. It is from this order that Calwell appeals.

This Court accords a plenary review to the circuit court's order granting summary judgment: "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). In conducting our de novo review, we apply the same standard for granting summary judgment that is applied by the circuit court. Under that standard,

> [s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

*Id*. at 190, 451 S.E.2d at 756, syl. pt. 4.

On appeal, Calwell first asserts that the circuit court erred by refusing to hold that the 2014 Order bars Humphreys from receiving 12.5% of the $3,000,000.00 because the 2014 Order specifically conditioned Humphreys' right to share in future fees upon the occurrence of the "triggering event," which never occurred. We disagree. There is no

4

assertion that the fee sharing agreement is invalid. Likewise, there is no genuine dispute that the fees in question were awarded in the Monsanto litigation and therefore subject to the fee sharing agreement. The 2014 Order merely interpreted the fee sharing agreement within the context of the Monsanto litigation as it stood at that point in time. The fact that Calwell was later able to negotiate the removal of the triggering event for a lesser fee does not remove that lesser fee award from the scope of the fee sharing agreement. Accordingly, the circuit court did not err in refusing to hold that the 2014 Order bars Humphreys from receiving 12.5% of the fee.

Next, Calwell asserts that the circuit court erred by refusing to hold that Humphreys was judicially estopped from sharing in the fee because Humphreys' bankruptcy disclosures were insufficient. Again, we disagree. In West Virginia:

> Judicial estoppel bars a party from re-litigating an issue when: (1) the party assumed a position on the issue that is clearly inconsistent with a position taken in a previous case, or with a position taken earlier in the same case; (2) the positions were taken in proceedings involving the same adverse party; (3) the party taking the inconsistent positions received some benefit from his/her original position; and (4) the original position misled the adverse party so that allowing the estopped party to change his/her position would injuriously affect the adverse party and the integrity of the judicial process.

Syl. Pt. 2, *W. Va. Dept. of Transp., Div. of Highways v. Robertson*, 217 W.Va. 497, 618 S.E.2d 506 (2005). Here, Humphreys' assertion of a claim for breach of contract is not clearly inconsistent with the position taken in the bankruptcy proceedings. Humphreys disclosed "referral/joint representation agreements" as one of the various classes of assets available for administration and "Co-Counsel Agreements" that the reorganized firm would assume. Further, the bankruptcy court approved the disclosure statement and found that it contained "adequate information" enabling creditors to make an informed decision on the proposed reorganization plan. Just as the circuit court held, this Court declines "to step into the shoes of the bankruptcy court and second guess the sufficiency of that disclosure." Accordingly, the circuit court did not err by refusing to hold that Humphreys was judicially estopped.

Accordingly, we affirm the May 2, 2023, order of the Circuit Court of Putnam County.

Affirmed.

**ISSUED:** May 23, 2024

**CONCURRED IN BY:**

Chief Judge Thomas E. Scarr
Judge Charles O. Lorensen
Judge Daniel W. Greear